UNITED STATES of America,
Appellee,

v.

Kenneth B. TERRY, a/k/a "Kenny
Polo," Defendant, Appellant.

No. 00–1079.

United States Court of Appeals,
First Circuit.

Heard Oct. 2, 2000.

Decided Jan. 10, 2001.

Noah R. Feldman for defendant-appellant.

Michael J. Pelgro, Assistant U.S. Attorney, with whom Donald K. Stern, U.S. Attorney, and Cherie L. Krigsman, Assistant U.S. Attorney, were on brief, for appellee.

Before TORRUELLA, Chief Judge, LYNCH and LIPEZ, Circuit Judges.

LYNCH, Circuit Judge.

Kenneth Terry was convicted by a jury on evidence that he was a dealer in crack and powder cocaine. He argued in his defense that he was a former dealer trying to lead a clean life until he was pressured and enticed into the life of crime again by two undercover police informants. His appeal argues that the jury's rejection of his entrapment defense resulted from the trial judge's error in instructing the jury on entrapment. He also argues that his sentence was too severe because the government engaged in manipulation of his sentence by enticing him to deal specifically in crack cocaine, and that the trial judge erred, in any event, in the amount of the drugs attributed to Terry. His last argument is that, under *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), certain matters that the trial judge used to increase his sentence—that is, the fact of a prior conviction, the amount of drugs involved in the charged offense, and the consideration of another transaction the court considered "relevant conduct"—were issues which should have been resolved by the jury and not by the judge. We reject these arguments and affirm the conviction and sentence.

I.

We describe the evidence as the jury could have found it. Kenneth Terry and Rafael Perez became acquainted in the early 1990s. Perez was then regularly supplying large quantities of cocaine to a Boston drug dealer named David Dinkins, who converted the powder cocaine into crack cocaine and sold it to customers. Perez regularly saw Terry at the Dinkins apartment, where Terry was a large and steady customer. Terry and Perez both knew Aundra Bennett, another customer. Dinkins, Terry, Perez, and Bennett at least once traveled together to New York City to purchase cocaine there.

Dinkins died in late 1995. In January 1996, Terry and Perez entered into a part-

nership in which Perez supplied Terry with crack cocaine for sale to Terry's customers. In early 1997, Bennett (now cooperating with federal DEA agents) contacted Terry seeking to purchase drugs. Terry, in response, told Bennett to page Perez, and that he would tell Perez that Bennett would be paging him, so that Perez would respond to the page. In February 1997, Bennett contacted Perez and set up a purchase of 125 grams of powder cocaine, and the sale was made on February 12. In March 1997, Bennett contacted Terry, complaining that Perez had failed to respond to another of his pages; Terry said that he would have Perez call Bennett. Perez later called Bennett and arranged the sale of 250 grams of powder cocaine, made on March 11.

In a chance encounter in late May 1997, Terry quoted Bennett a price of $3700 for 125 grams of crack cocaine. When Bennett did not get back to him, Terry called Bennett and offered to lower the price to $3200, and in June 1997, Bennett contacted Terry and agreed to purchase 125 grams at that price. On June 12, Terry sold approximately 125 grams of crack cocaine to Bennett. On June 23, 1997, Bennett contacted Terry again, and on June 24, Terry sold Bennett approximately 250 grams of crack cocaine. Again, on July 30, 1997, Terry sold Bennett approximately 250 grams of crack cocaine. During this sale, Terry told Bennett that he was suspicious that there was police surveillance. Bennett had no further contact with Terry for about a year.

In July 1998, at the DEA's request, Bennett contacted both Perez and Terry to discuss a purchase of two and one-half kilograms of crack cocaine. After several discussions negotiating price and logistics, Terry told Bennett that Perez's supplier wanted to confirm that the money was there. Bennett arranged to show Terry the $48,000 in cash, but the meeting aborted when Terry told Bennett that he had observed police surveillance. No deal was made.

On July 27, 1998, Perez was arrested on state warrants and Perez offered to cooperate. Under instructions, Perez contacted Terry on July 29 and sought to arrange a sale of two to three kilograms of cocaine. Perez and Terry had several conversations about the purchase and Terry's efforts to find customers. On August 3, Perez told Terry that his supplier wanted to see the money first, and Terry replied that his customers were reluctant to give it to him. In the ensuing negotiations, Perez said that he had been wanting to deal with this supplier for the longest time. He told Terry that Terry had to "get me on" this deal because "this is the deal that I had been waiting for." Perez urged Terry to help him get "out of this mess" created by Perez's drug debts. When Terry was again recalcitrant about showing the money, Perez urged Terry to find a way, saying that "this is the opportunity of my lifetime." Perez also suggested that he might seek out other customers for the cocaine.

On August 4, Terry told Perez that if his customers gave him the money, Terry would have to accompany Perez to the sale. Terry later told Perez that he only wanted to purchase one kilogram of cocaine. Perez agreed, and arrangements were made to meet that evening. That evening, at the agreed meeting point, Terry was arrested with approximately $19,000 in cash in his possession.

The final indictment contained seven counts against Terry and/or Perez. Count One charged both Terry and Perez with conspiracy to distribute powder cocaine and crack cocaine in Boston from January 1996 to July 1998, in violation of 21 U.S.C. § 846. Counts Two and Three charged Perez with distribution of cocaine in connection with the February 12 and March 11, 1997 sales to Bennett in violation of 21 U.S.C. § 841(a)(1). Counts Four, Five, and Six charged Terry with distribution of crack cocaine for the June 12, June 24, and July 30, 1997 sales to Bennett, in violation

of 21 U.S.C. § 841(a)(1).[1] Count Seven charged Terry with attempted possession of crack cocaine with intent to distribute in connection with the final August 4, 1998 attempted purchase, again in violation of 21 U.S.C. § 841(a)(1).[2]

At trial, Terry did not challenge the facts charged but instead presented an entrapment defense. Terry argued that Bennett threatened him, leading him to make the 1997 sales, and that Perez made undue appeals to sympathy to induce him to undertake the 1998 attempted purchase. The entrapment defense only responds to Counts Four to Seven, and does not go to the general conspiracy charge in Count One. In closing, Terry's lawyer argued that Bennett and Perez used "excessive pressure, threats, and appeals to sympathy" to induce Terry to commit the crimes charged. At the conclusion of trial, the district court instructed the jury on entrapment, giving a full charge. However, the court later made a correction to the jury verdict form, and then expanded upon the entrapment instructions by use of example, this time omitting reference to "appeals to sympathy." The alleged impact of this correction and expansion provides one of the bases of this appeal. The jury returned its verdict, finding Terry guilty on all counts.

At the sentencing hearing, the district court determined that Terry was responsible for 2.7 kilograms of crack cocaine and 370.9 grams of powder cocaine, and therefore set Terry's offense level at 38. The district court also determined that Terry's prior drug conviction[3] put him in criminal history category IV. Together these provided for a Guidelines sentencing range of 324–405 months imprisonment. The court denied Terry's request for downward departure and sentenced Terry to 324 months, the low end of the applicable range.

## II.

### A. The Jury Instructions

■ Terry argues that he was entitled to an instruction that entrapment may consist of "an undue appeal to sympathy." Under *United States v. Gendron*, 18 F.3d 955, 961–62 (1st Cir.) *cert. denied*, 513 U.S. 1051, 115 S.Ct. 654, 130 L.Ed.2d 558 (1994), playing upon defendant's sympathy is indeed one of the methods of entrapment this circuit recognizes.

■ Here, the judge did give exactly that instruction. Initially the court charged the jury that there was no entrapment if the government proved beyond a reasonable doubt that the officers and undercover agents:

> did not persuade or talk Mr. Terry in to committing the crime. Simply giving someone an opportunity to commit a crime is not the same as persuading the person to commit a crime, but excessive pressure by the law enforcement people, the undercover informants, or an undue appeal to sympathy, can be improper.

Terry challenges not this charge but rather a problem that arose later.

Terry contends that the jury may have been misled by a sequence of three events which, he says, made it appear the judge told the jury that this earlier instruction was in error. At the end of the instruction the judge told the jurors that he would be

1. The conspiracy count and each distribution count against Terry contained a notice stating that the offense involved 50 grams or more of cocaine base and that the ten-year minimum mandatory sentence set forth in 21 U.S.C. § 841(b)(1)(A)(iii) was applicable.

2. While the indictment charged attempted possession of crack cocaine in Count Seven, the deal arranged between Terry and Perez actually involved powder cocaine. During trial, the government sought to amend the indictment to reflect this fact, and the trial court agreed, though it noted that as a result of the amendment, it would not include the amount of drugs from this deal in sentencing calculations.

3. In 1992, Terry had served six months on federal charges of conspiracy to distribute cocaine.

back to them, after he talked with counsel, if there were any matters needing clarification or mistakes needing correction, ending his instructions by stating

Now, I may have left something out, I may have explained some aspect of the law improperly, and before we let you retire and call off the alternates the lawyers get a chance to call that to my attention, so I'll see counsel at the side bar.

At the ensuing side bar, Terry's counsel objected to the entrapment instruction as inadequate, and asked that the court more fully describe examples of improper inducement as laid out in *Gendron* and *United States v. Gamache*, 156 F.3d 1 (1st Cir.1998). Counsel stated that under these cases:

the examples of improper inducement includes intimidation or threats, substantial pressure through persistent efforts to induce criminal activity over an extended period of time, appeals to sympathy, and false statements or other conduct which creates a risk of causing an otherwise unwilling person to commit the offense.

The court agreed to give this charge, with the exception of "appeals to sympathy," and Terry's counsel noted his objection. Also at side bar, the government noted that a mistake had been made in the jury form on Count Seven, which mistakenly stated that the offense involved cocaine base instead of reflecting the amendment of the charge to powder cocaine.

After conferring with counsel, the judge then returned to the jury and stated that there had been a mistake, saying "There is—I did make a mistake and it's a mistake of, what I'm going to have to do is change the verdict slip." The judge went on to explain that the verdict slip for Count Seven would be changed to say powder cocaine, not cocaine base. The court then continued, going on to give the *Gendron* charge requested by Terry's counsel at the side bar, though now omitting the "appeals to sympathy" language, stating:

One other thing I would like to tell you is to just give you some examples of improper inducement as they are found in the law. Intimidation or—improper inducement which could constitute entrapment. Let me go back to that. Improper inducement to commit a crime which could constitute entrapment. I'm just giving you some examples:

Intimidation or threats; substantial pressure through persistent efforts to induce criminal activity over an extended period of time; false statements or other conduct which creates a risk of causing an otherwise unwilling person to commit the offense.

Given this sequence of events, Terry argues, the jury could have understood this clarification of the entrapment instructions by the judge as saying that the earlier instructions on entrapment were error. This problem was compounded, says Terry, when the judge gave new entrapment instructions by giving examples of entrapment through pressure but did not, despite defendant's request and no government objection, give again the "undue appeals to sympathy" instruction. And so, Terry concludes, the jury may have been left thinking that the revised instructions removed "undue appeals to sympathy" as a method of entrapment. This omission was important, Terry maintains, because part of his defense relied on the seductive blandishments of Perez as well as the fear-inducing pressure of Bennett, and so he depended on the undue appeals to sympathy instruction.

Trials are fast moving events and transcripts do not always capture the truth of the moment. We cannot be entirely sure from the cold transcript whether it was clear to the jury that the mistake alluded to by the trial judge pertained only to a matter other than the entrapment instruction. The government attorney says that it was clear; defendant demurs. We think the likelihood of a mistaken impression by the jury is very low, given that the judge

started the topic of instructions by saying, "One *other* thing I would like to tell you is to just give you some examples of improper inducements as they are found in the law" (emphasis added). Also telling is that defense counsel did not object on the ground that the jury misunderstood and thought the original entrapment instruction had also been a mistake. What we can say was that in context the jury was fairly instructed on the defense theory, and that suffices.

The importunings by Perez occurred late in the game for Terry. The government had set up a series of drug buys with Terry through Bennett in 1997 (the subject of Counts Four, Five, and Six). In 1998, another transaction was set up with Perez (Count Seven). Terry agreed to do the 1998 deal and then Terry and Perez started haggling over terms. Trying to convince Terry to front the money for the transaction, Perez implored Terry that this was the deal of a lifetime, that it would enable Perez to put behind him some heavy debts, and the like. These statements by Perez are the source of the claim for an "undue appeal to sympathy" instruction. Thus the case involved two different entrapment theories: fear and pressure as to the Bennett transactions in 1997 and appeals to sympathy in the Perez transaction in 1998. The Bennett transactions were more numerous and more important, in many ways, to Terry's defense. A jury that rejected entrapment for a number of transactions in 1997 with Bennett was unlikely to accept entrapment as a defense in a 1998 transaction with Perez. That is particularly so because no intimidation was involved in the 1998 transaction but only statements to the effect that Terry, having already agreed to do the transaction, should do it on particular financial terms as a favor to Perez.[4]

In this context, the trial judge agreed to the defenses request to supplement the jury instructions by giving examples of "improper inducements." The court had already earlier instructed the jury that "[s]imply giving someone the opportunity to commit a crime is not the same as persuading the person to commit a crime, but excessive pressure by the law enforcement people, the undercover informants, or an undue appeal to sympathy, can be improper." The judge then supplemented this earlier instruction by telling the jury he was giving it some examples of improper inducements: "Intimidation or threats; substantial pressure through persistent efforts to induce criminal activity over an extended period of time; false statements or other conduct which creates a risk of causing an otherwise unwilling person to commit the offense." These latter two descriptions encompass both Bennett's and Perez's efforts, and so go to both the undue appeals to sympathy and fear prongs of the entrapment defense. Thus, this case is not like *United States v. Montanez*, 105 F.3d 36 (1st Cir.1997), where the court held that instructions on entrapment giving examples applicable only to inducement through fear are insufficient where the defense theory rests on appeals to sympathy.

Although the court did not explain why it refused to use again the phrase "undue appeal to sympathy," it is reasonable to think that the court itself did not want, by repeating the instruction, to give undue weight to one aspect of the defense, and the more minor part of the entrapment defense at that. Taken as a whole, the defense theory was fairly captured by the instructions given. *See United States v. Arcadipane*, 41 F.3d 1, 8 (1st Cir.1994) ("[J]ury instructions are to be evaluated in the context of the charge as a whole...."). For these reasons, we uphold the conviction the jury arrived at on those instructions.

---

**4.** Also recall that the trial judge did not include the 1998 transaction (Count Seven) in his sentencing calculations.

## B. Sentencing Factor Manipulation

■ Terry says that the government agents improperly subjected him to the higher penalties imposed for crack cocaine, insofar as they ordered their informant Bennett to make purchases of crack cocaine from Terry, especially after having Bennett purchase only powder cocaine from Perez. Terry also argues that the DEA strung out the investigation in order to have more deals and thereby have a larger amount of drugs to attribute to him. *See United States v. Montoya,* 62 F.3d 1, 3–5 (1st Cir.1995) (holding that sentencing factor manipulation should be found where, through extreme or outrageous conduct, "government agents have *improperly* enlarged the scope or scale of the crime" through their control over the sting operation) (emphasis in original). In light of this purported manipulation, Terry contends that he should have been given a downward departure on his sentence, as he requested. The district court denied the request, saying that it did not believe that Terry was "an innocent person who took a bite at the poisoned apple." The decision of the district court not to grant such a downward departure is reviewed for clear error. *Id.* at 4.

The evidence does not support the claim of government misconduct. Perez testified that he and Terry had sold both crack and powder cocaine since January 1996 and that Terry regularly received large supplies of crack. In his discussions with the informants Terry had a ready facility with the street prices of both crack and powder cocaine and quoted prices for kilograms of both. The government, when investigating the business of a drug dealer who by reputation sells both crack and powder cocaine, is under no obligation to buy only that product or quantity which would produce the smallest sentence for the defendant. As to the duration of the investigation, the government says it was attempting to trace other individuals involved in the drug network, to establish that Terry was a dealer in both sub-

stances, and to remove the narcotics from the streets—surely all permissible purposes. This is simply not the "extreme and unusual case" for which the sentencing factor manipulation doctrine was meant. *Montoya,* 62 F.3d at 4; *see also United States v. Gibbens,* 25 F.3d 28, 31 (1st Cir.1994) (stating that finding of sentencing factor manipulation must rest on a finding of "extraordinary misconduct" by the government).

## C. Sufficiency of the Evidence on Drug Quantities

■ Terry also argues that the district court committed clear error in attributing to him the quantities of drugs involved in two transactions that were not charged to him: Perez's sale of powder cocaine to Bennett and crack possessed by Andre Morris.

Perez sold some 370.9 grams of powder cocaine to Bennett in February and March 1997. Those sales both took place before Bennett and Terry had made a transaction. Under the Guidelines, acts of third parties are attributable to a defendant if they are taken in furtherance of a joint criminal activity and they are reasonably foreseeable. *See* U.S.S.G. § 1B1.3(a)(1)(B) (in determining the offense level in light of relevant conduct, courts consider "in the case of a jointly undertaken criminal activity ..., all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity"); *see also* U.S.S.G. § 1B1.3 cmt. (background) ("[D]rugs not specified in the count of conviction are to be included in determining the offense level if they were part of the same course of conduct or part of a common scheme or plan as the count of conviction."); *United States v. LaCroix,* 28 F.3d 223, 226–28 (1st Cir.1994). Terry's theory is that while Terry and Perez may have had a business arrangement, it had nothing to do with the separate arrangement between Perez and Bennett. Even if there were some relationship between the two business arrangements, Terry argues,

72

he had no reason to think that Perez would sell drugs to Bennett as a result of Terry's giving Perez's phone number to Bennett.

The district court's contrary conclusion was plainly supported by the evidence. When Bennett called Terry in March 1997, the two men discussed drug prices, Terry gave Bennett the phone number to reach Perez, and said that Perez would "take care of him." Terry then called Perez to be sure that he knew Bennett would try to reach him. That was enough to link Terry to those transactions.

The second argument is that some 64 grams of crack, found in the car of Andre Morris after his arrest on January 16, 1997, could not be attributed to Terry. The two men had just conducted a drug transaction in a parking lot and Terry was also arrested then. Terry did not raise this issue before the district court, and so it is waived. We note that, in any case, even if the amount of these drugs were subtracted from the total, Terry's offense level would remain the same.

## D. *Apprendi* Issues

■ Terry was sentenced to 27 years imprisonment. After this appeal was briefed, the Supreme Court decided *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). Under *Apprendi*, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 120 S.Ct. at 2362–63; *see also Sustache–Rivera v. United States*, 221 F.3d 8 (1st Cir.2000). Counsel filed supplemental briefs on the effect of *Apprendi* on this case.

5. Unlike the other counts, Count One found Terry in violation of 21 U.S.C. § 846. However, § 846 adopts the sentencing scheme of 21 U.S.C. § 841.

6. In accordance with the court's agreement to allow the government to amend Count Seven, the court based Terry's sentence solely on Counts One, Four, Five, and Six.

■ Kenneth Terry raises three *Apprendi* issues involving his sentence. At sentencing, the court calculated his sentence on the basis of its determination of (1) his prior conviction for a drug offense, (2) the quantity of drugs involved in the conduct underlying the convictions, and (3) additional quantities of drugs involved in "relevant conduct" for which he was not charged or convicted. None of these facts were charged in the indictment nor submitted to the jury for proof beyond a reasonable doubt. Terry argues that the court's reliance on these determinations at sentencing deprived him of his right to a jury trial, as the determinations are properly enhancement elements that must be proven to the jury beyond a reasonable doubt rather than sentencing factors that the judge may determine by a preponderance of the evidence.

The relevant statutory provisions provide statutory sentencing maximums for a violation of 21 U.S.C. § 841(a)(1)[5] as follows: 21 U.S.C. § 841(b)(1)(A) provides for a maximum penalty of life where the offense involves 50 or more grams of cocaine base; 21 U.S.C. § 841(b)(1)(B) provides for a maximum sentence of 40 years where the offense involves 5 or more grams of cocaine base; and 21 U.S.C. § 841(b)(1)(C) provides a statutory maximum sentence of 20 years for any conviction not otherwise covered regardless of amount, except that the maximum sentence increases to 30 years where there is a prior finalized conviction for a drug offense. Terry was sentenced to 324 months, or 27 years, in prison, plus 10 years supervised release, on the four counts of conviction.[6]

The only objections[7] at sentencing regarding these three determinations did not

7. The defense did object to the amount of drugs, but only to the extent that the Perez–Bennett transactions were included, as addressed above; the only objection to the prior conviction was that it was "over-representative" and therefore grounds for a departure under § 4A1.3.

address the failure to have these three matters submitted to the jury for proof beyond a reasonable doubt. Nor were the arguments in the initial briefs on appeal addressed to this point. As a result, our review of these three claimed errors is for plain error.

■ Review for plain error requires four showings: (1) that there was error; (2) that it was plain; (3) that the error "affect[ed] substantial rights"; and (4) that the error affected the "fairness, integrity, or public reputation of judicial proceedings." *See Johnson v. United States,* 520 U.S. 461, 465–67, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997); *United States v. Olano,* 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993); *cf. United States v. Mojica–Baez,* 229 F.3d 292, 306–07 (1st Cir.2000) (applying plain error review to failure to submit to the jury whether a semiautomatic assault weapon was used in an offense under 18 U.S.C. § 924(c)(1), as required under *Castillo v. United States,* 530 U.S. 120, 120 S.Ct. 2090, 147 L.Ed.2d 94 (2000)). After examining the facts of this case, we conclude that there was no plain error.

*Apprendi,* in a sense, was a simpler case. It was a state case with a single statutory maximum penalty, subject to an enhancement. It did not involve the complex charting and several potential maximums of the federal Sentencing Guidelines that are involved here. The federal drug statute provides for a structure of gradations in maximum sentences. *See* 21 U.S.C. § 841(b)(1). The maximum possible sentence for distributing cocaine, provided no bodily harm results, would be life imprisonment. But that is subjected to gradations based on the amount of drugs involved: if the amount of drugs were less than 5 grams, then the statute provides for a maximum sentence of 20 years; if the offense involved 5 to 50 grams of drugs, then the mandatory sentencing range pro-

vided by the statute is 5 to 40 years; at 50 grams, the maximum penalty increases to life. Here, even apart from the amount of drugs involved, because of a prior conviction for a drug crime, Terry faced (at the lowest) a maximum sentence of 30 years under 21 U.S.C. § 841(b)(1)(C).[8.]

Quite properly, no one suggests that there be separate *Apprendi* analyses for each separate possible maximum. Both sides agree that if the 30 year maximum for the prior felony conviction holds, then there is no *Apprendi* issue in this case as to whether the jury must determine whether the trigger point in the drug quantity range had been met. Presumably, the reason for that agreement is that defendant was sentenced to 27 years, within the 30 year maximum sentence when there is a prior drug felony. Thus if Terry loses on his first claim—that the fact of the prior drug conviction had to be decided by the jury—then his second and third claims disappear, because he was sentenced within the prescribed range. *Cf. United States v. Baltas,* 236 F.3d 27 (1st Cir.2001) (holding that *Apprendi* does not apply to drug quantity determinations where the judge-made factual determination does not increase the maximum sentence beyond the statutory maximum).

Terry's first attack, unfortunately for him, would require this court to overrule the Supreme Court decision in *Almendarez–Torres v. United States,* 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998). *Almendarez–Torres* held that the use of the fact of a prior conviction in sentencing, where that fact was found by the judge rather than the jury, did not violate the right to a jury trial. Terry points out that if you count heads, the combination of the justices in the majority in *Apprendi* and in the dissent in *Almendarez–Torres* would provide a majority on the Supreme Court to overrule *Almendarez–Torres.* Perhaps so, but until *Almendarez–Torres* is over-

---

**8.** And to further complicate matters, if the sentences for each count ran consecutively rather than concurrently, the statutory maxi-

mum (even without the prior conviction) would be 80 years.

ruled, we are bound by it. This means that Terry's sentence was within the 30 year statutory maximum, and so *Apprendi* does not apply. *See, e.g. Talbott v. Indiana,* 226 F.3d 866, 869 (7th Cir.2000) (holding that *Apprendi* does not change the fact that the judge alone determines drug types and quantities when imposing sentences short of the statutory maximum).

▉ Lest Terry be left with unrealistic hopes for a future vindication, we make a second holding against him. Even were *Almendarez–Torres* overruled, it is clear that Terry cannot establish plain error as to the fact that a judge, not a jury, decided the drug quantity. Even assuming *arguendo* that *Apprendi* would apply here, were there no prior conviction,[9] Terry fails at least the third and fourth elements of the test for plain error.

Under the "affecting substantial rights" prong, Terry must show prejudice by demonstrating that the error "affected the outcome of the district court proceedings." *Mojica–Baez,* 229 F.3d at 307 (internal quotations omitted). We ask what prospects there were that the submission of the question—whether the trigger drug quantity amount was met[10]—to the jury would have resulted in a different outcome, keeping in mind the higher standard of proof required before a jury. *Cf. id.* Given the trial evidence about the quantity of drugs, there was no prejudice to Terry.

In each of the three transactions in 1997, Terry directly sold Bennett, a cooperating witness, far more than 50 grams of cocaine base in controlled buys. The uncontested testimony of a DEA chemist at trial established the quantities and types of the drugs involved in these sales. The defendant's defense of entrapment conceded that these events occurred as charged. It is not possible to find that the defendant was prejudiced by the unobjected-to failure of the trial court to submit to the jury the question of whether or not Terry's offenses involved 50 or more grams of cocaine base. Nor would we, applying the fourth factor under *Olano,* find any miscarriage of justice.

Nor does the failure of the indictment to specify that the offenses involved 50 or more grams of cocaine constitute an error of sufficient dimension to justify vacating Terry's sentence. *See Mojica–Baez,* 229 F.3d at 308–10. We review the alleged indictment error in this case for plain error. *See id.* at 311. The indictment was entirely proper under the law at the time, and there was no unfairness to the defendant in terms of notice.[11] Nor is there any reason to believe that the grand jury would not have returned an indictment including such amounts if requested. As it happens, the evidence as to the amount of drugs was presented to the petit jury, and not contested by the defendant. That evidence may well have been presented to the ·

---

9. Several courts to have addressed the application of *Apprendi* to drug amounts have found them to be enhancement elements properly submitted to the jury where the drug quantity extends the sentence beyond the otherwise applicable maximum. *See, e.g., United States v. Sheppard,* 219 F.3d 766, 767 (8th Cir.2000) ("Based upon the Supreme Court's recent decision in *Apprendi v. New Jersey,* . . . we conclude that drug quantity must often be treated as an element of the offense under § 841. . . ."); *United States v. Williams,* 235 F.3d 858, 863 (3rd Cir.2000); *United States v. Hishaw,* 235 F.3d 565, 574–76 (10th Cir. 2000); *United States v. Shepard,* 235 F.3d 1295, 1296 (11th Cir.2000); *United States v. Flowal,* 234 F.3d 932, 936 (6th Cir.2000); *United States v. Doggett,* 230 F.3d 160, 164–65

(5th Cir.2000); *United States v. Angle,* 230 F.3d 113, 124 (4th Cir.2000); *United States v. Nordby,* 225 F.3d 1053, 1059 (9th Cir.2000). We do not reach the issue.

10. Although some courts have referred to the jury deciding drug quantity, more precisely, the issue for the jury may instead be which trigger amount applied.

11. For the conspiracy count and each distribution count, the indictment did include a notice that the offense involved 50 or more grams of cocaine base and therefore conviction compelled the application of at least the ten-year minimum mandatory sentence required by § 841(b)(1)(A)(iii).

grand jury; we do not know. There is no question that the petit jury in this case would have found Terry's offenses to involve 50 or more grams of cocaine base. Since the failure to include the amount of drugs involved in the indictment did not necessarily render the indictment unfair or make it an unreliable vehicle with which to commence proceedings in this case, we reject the argument that *Apprendi* requires the sentence be vacated on the basis of that failure. *Cf. id.* at 311–12.

## III.

We affirm the conviction and sentence imposed by the district court.